**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON
CIVIL ACTION NO. 13-53-JGW**

**JOHN BEAUCHAMP, et al.**                                                        **PLAINTIFFS**

**V.**

**FEDERAL HOME LOAN MORTGAGE CORP., et al.**                **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER[1]**

Items belonging to plaintiffs John Beauchamp and Jessica Klingenberg were thrown away by persons operating under the direction of defendants Regional Realty and Eibeck Realty.[2]  Eibeck Realty, in turn, was operating pursuant to a contractual arrangement with defendant Federal Home Loan Mortgage Corp. ("Freddie Mac").  The overarching question currently before the Court is whether Freddie Mac bears any responsibility for plaintiffs' lost property.  Toward that end, pending are a motion for summary judgment filed by Freddie Mac (doc. 97) and a motion for partial summary judgment filed by plaintiffs.  Doc. 99.  After considering the record and applicable law, the Court will grant Freddie Mac's motion for summary judgment and deny plaintiffs' motion for partial summary judgment.

## I.  Relevant Factual and Procedural History

Eibeck Realty had a contractual relationship with Freddie Mac whereby Eibeck Realty was authorized to manage, market and sell real estate owned by Freddie Mac.  *See, e.g.,*

---

1  Pursuant to 28 U.S.C. §636(c), the parties have consented to a magistrate judge presiding over all aspects of this case.  *See* Doc. 30.
2 Defendants' amended answer asserts that "[t]here is no legal entity known as Regional Realty Group, LLC. 'Regional Realty Group' is an assumed name of Eibeck Realty Group, LLC."  Doc. 27, p. 3.  Terry Eibeck, Regional and Eibeck Realty's owner ("Eibeck"), testified similarly that Regional is "an assumed name for Eibeck Realty Group."  Doc. 94 (hereafter "Eibeck Depo."), p. 5. For simplicity's sake, the Court thus will refer to defendants Eibeck Realty and Regional Realty collectively as "Eibeck Realty" and Terry Eibeck as "Eibeck."

Deposition of Charlette Williams (doc. 100) (hereafter "Williams Depo."), p. 16.  In August 2012, a condominium and associated detached garage located at 20 Highland Meadows Circle in Highland Heights, Kentucky was assigned by Freddie Mac to Eibeck Realty to prepare for foreclosure-based resale.  *Id.* at p. 36-37.

Eibeck Realty's first task was to ascertain if the property was empty.  *Id.* at 38.  Eibeck Realty was permitted to enter the property if it were empty.  *Id.* at 38-39.   If property with a value of less than $300 was present, Eibeck Realty was supposed to perform a "trash out;"[3] if property with a value above $300 was present, Eibeck Realty was directed to notify Freddie Mac so eviction proceedings could be instituted.  *Id.* at 47.  According to the contractual relationship between Eibeck Realty and Freddie Mac, if Eibeck Realty was uncertain if property had a value over $300 or if any personal property had inherently sentimental or intrinsic value,[4] Eibeck Realty was to err on the side of caution and contact Freddie Mac's eviction coordinator.  *Id.* at 50-51, 61.   When entering the property, Eibeck Realty was required to make an inventory of the property's contents.  *Id.* at 57.  At his deposition, Eibeck answered "[y]es" when asked if the contract with Freddie Mac and the training he had undergone left him with "very little discretion in the procedures for preservation and maintenance required by Freddie Mac[.]"  Eibeck Depo, p. 51.

Eibeck entered the condominium to be foreclosed upon in August 2012. Eibeck Depo. at 33.  However, Eibeck did not learn there was a garage associated with that condominium until

---

3 The complaint defines a "trash out" as "the process whereby the property of a foreclosed residence is removed and destroyed in order to oust the prior owners and/or prepare the foreclosed residence for sale."  Doc. 1, p. 3.  In her Rule 30(b)(6) deposition on behalf of Freddie Mac, Charlette Williams, a manager employed by Freddie Mac, similarly defined a trash out as "a removal of  personal property—trash.  I mean, it's the removal of items that have been left behind by the prior occupant."  Williams Depo., p. 47.
4 Among the specific items listed as having intrinsic value were family photos and diplomas.  Williams Depo., p. 62.

early October 2012. *Id.* Prior to entering a garage on October 4 (*id.* at 52), Eibeck spoke with an as-yet unidentified individual at a property management company who told him that the garage corresponding with 20 Highland Meadows Circle was "directly across the street from the main entry of building number 20." *Id.* at 39. Unfortunately, Eibeck incorrectly concluded that the garage belonging to plaintiffs was the corresponding to 20 Highland Meadows Circle.

As plaintiff Klingenberg testified in her deposition, identification of the proper detached garage belonging to each condominium was rendered more difficult by the fact that the area contained four buildings, each of which contained multiple condominiums, clustered together with four sets of corresponding detached garages. Doc. 92 (hereafter Klingenberg Depo.), p. 8. In fact, the garage corresponding with condominium number 9 of building 20 and the garage corresponding with condominium number nine for building 19 were roughly equidistant from the front door of building number twenty. *Id.* at 12. Nonetheless, Eibeck did not consult any local residents or the condominium owners association to make sure he ascertained the proper garage. Eibeck Depo., p. 47. Eibeck also did not retrieve a plat or deed to verify which garage corresponded to 20 Highland Meadows Circle. *Id.* at 49-50.

Eibeck gained entry to plaintiffs' garage by simply lifting the door handle. *Id.* at 52-53. Eibeck then began to inventory the garage's contents. Eibeck's inventory placed a total value of $175 on the garage's contents. Doc. 99-10. Among the enumerated contents on the inventory prepared by Eibeck were a photo collage, textbooks, "loose" photos, and a homemade wooden shelf. *Id.* Klingenberg testified that one of the containers in the garage had awards she had won in high school and college, as well as yearbooks and photos from her high school graduation. Klingenberg Depo., p. 21. Additionally, Beauchamp's military uniforms were in the garage. *Id.*

3

at 30.  Beauchamp testified that he had numerous military uniforms, medals and ribbons in the garage, including an irreplaceable framed photo of his boot camp graduating class.  Doc. 93 (Beauchamp Depo.), p. 26-27.  A sentimentally valuable chair given to Beauchamp by his deceased aunt was also in the garage.  *Id.* at 32.   Because the inventory did not contain an itemization of all items in the garage, Beauchamp labeled the inventory prepared by Eibeck "grossly insufficient . . . ."  *Id.* at 63.

Williams testified that military medals were an example of an item having intrinsic personal value.  Williams Depo., p. 63.  Eibeck agreed that family photos would be items possessing intrinsic personal value, but curiously stated he had no way of knowing whether the photos in the garage were family photos.  Eibeck Depo, p. 57.  Eibeck testified that he did not see any military medals or uniforms.  *Id.* at 60.  Based on his itemization and valuation of the garage's contents, Eibeck did not contact the property coordinator (*id.* at 66); instead, he hired a local company to conduct a trash out, which occurred about a week later.[5]  *Id.* at 67.

In November 2013, plaintiffs discovered their garage had been emptied.  Klingenberg Depo., p. 13.  Klingenberg contacted the Highland Heights police to report what she believed had been a robbery.  *Id.*  After speaking to the condominium complex's office, Klingenberg was given Eibeck's name.  *Id.* at 16-17.  Klingenberg called Eibeck, who told her that he had nothing to do with the wrong garage having been emptied.  *Id.* at 18.  Afterwards, Klingenberg gave Eibeck's name to the Highland Heights police (*id.* at 19), who contacted Eibeck.  Eibeck Depo. at 72.  According to Eibeck, that was when he first became aware that the wrong garage had been

---

[5] The fact that Eibeck Realty hired another entity to perform the actual trash out would not absolve Freddie Mac of vicarious liability if Eibeck Realty had been Freddie Mac's agent.  *See, e.g., Williams v. Kentucky Dept. of Educ.*, 113 S.W.3d 145, 151-152 (Ky. 2003).

trashed out.  *Id.*   However, Eibeck did not notify Freddie Mac about the improper trash out until April 2013.  *Id.* at 75.  Williams testified that Eibeck should have notified Freddie Mac when he discovered the improper trash out had occurred.  Williams Depo., p. 70-71.

Plaintiffs filed this action pro se against Freddie Mac and Eibeck Realty in April 2013. Doc. 1.  The complaint raised a host of state law causes of action, ostensibly against all defendants:  negligence; gross negligence; negligent hiring; negligent supervision; negligent infliction of emotional distress; conversion; trespass to chattel; trespass to land; intrusion upon seclusion; public disclosure of private matters; commercial appropriation; and wrongful foreclosure.[6]  *Id.*  Doc. 1, p. 4-8.

After extended procedural wrangling, Freddie Mac (which at the time was jointly represented with Eibeck Realty) filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) in October 2014.  Doc. 51.  The Court denied the motion in February 2015.  Doc. 67.[7]  Shortly thereafter, separate counsel appeared on behalf of Freddie Mac.  Doc. 70.  In March 2015, plaintiffs first retained counsel.  Doc. 75.  The pending motions for summary judgment were filed by Freddie Mac and plaintiffs in June 2015.  Docs. 97, 99.

**II.  Analysis**

The Court has considered all of the arguments raised by all parties.  In the interests of judicial economy, however, this memorandum opinion and order will address directly only the most pertinent arguments.

---

6 The case was filed in federal court because 12 U.S.C. §1452(f) provides in relevant part that "all civil actions to which [Freddie Mac] is a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such actions, without regard to amount or value . . . ."
7 Because Freddie Mac had already filed an answer, the Court converted the 12(b)(6) motion to a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

### A.  Summary Judgment Standard of Review

Summary judgment is proper only if the facts on file with the court demonstrate that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party may discharge its burden by "pointing out . . . an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party cannot rest on its pleadings, but must identify specific facts that remain in dispute for the finder of fact at trial.  *See id.* at 324.  Although all inferences are drawn in favor of the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), the nonmoving party must present significant and probative evidence in support of its complaint.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  "Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment."  *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).

The court's function is not to weigh the evidence and determine the truth of the matters asserted, but to determine whether a genuine issue of material fact remains for a fact finder at trial.  *Anderson*, 477 U.S. at 249.  The key inquiry is whether the evidence presents a "sufficient disagreement to require submission [of the case] to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts.  *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992).  Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989), and to designate

specific facts that are in dispute.  *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404-05.  The standard of review does not change when both parties move for summary judgment, nor does the presence of cross-motions mean that summary judgment must be granted if disputes remain as to material facts.  *See, e.g., Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949-50 (6th Cir. 2009).

### B.  Abandoned Causes of Action

In their motion for partial summary judgment, plaintiffs concede that "[d]iscovery has revealed that Plaintiffs cannot prevail on the following causes of action: 1) Negligent Hiring; 2) Negligent Infliction of Emotional Distress; 3) Commercial Appropriation; and 4) Wrongful Foreclosure. As such, Plaintiffs agree to dismiss only these four claims with prejudice."  Doc. 99-1, p. 1.  Therefore, the Court will not discuss further those four causes of action.

### C.  The Vicarious Liability Claims

The overarching issue in dispute is whether Eibeck Realty was an independent contractor or an agent of Freddie Mac.  Determining the proper relationship is paramount because, generally, if Eibeck Realty was as an independent contractor Freddie Mac would not be vicariously liable for Eibeck Realty's actions but Freddie Mac could be liable if Eibeck Realty was Freddie Mac's agent.[8]  *See, e.g., Zetter v. Griffith Aviation, Inc.*, 2006 WL 1117678, at *12 (E.D. Ky. April 25, 2006) ("Kentucky follows the general rule that an employer is not liable for the torts of an independent contractor in the performance of his job.") (quotation marks and

---

8 Although the complaint is not clear, plaintiffs now state that "Freddie Mac's liability is primarily vicarious" meaning that "[w]ith the exception of Plaintiffs' negligent supervision claim, proof of Freddie Mac's direct liability would be superfluous for the purposes of the pending Motion[s for summary judgment] . . . ."  Doc. 99-1, p. 3. Therefore, Freddie Mac's legal relationship with Eibeck Realty is crucial for all claims except negligent supervision/training, which will be discussed separately herein.

citation omitted); *Nazar v. Branham*, 291 S.W.3d 599, 606 (Ky. 2009) ("A principal may be held vicariously liable for the negligent acts of his or her agent, but generally is not held liable for the conduct of an independent contractor.").

For over fifty years, Kentucky courts have defined agency as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *McAlister v. Whitford*, 365 S.W.2d 317, 319 (Ky. 1962). The Kentucky Supreme Court has approved the following factors to determine whether an entity is an agent or an independent contractor:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

*Kentucky Unemployment Ins. Commission v. Landmark Community Newspapers of Kentucky, Inc.*, 91 S.W.3d 575, 579 (Ky. 2002).[9] Plaintiffs bear the burden to prove the existence of such a

---

9 Federal common law on agency is essentially equivalent. *See, e.g., Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989) ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the

relationship.  *Vandevelde v. Poppens*, 552 F.Supp. 2d 662, 666 (W.D. Ky. 2008) ("The burden of proving agency is on the party alleging its existence.") (quoting *Wright v. Sullivan Payne Co.*, 839 S.W.2d 250, 253 (Ky.1992)).

Though the Kentucky Supreme Court in *Landmark Community Newspapers* rejected earlier precedent which had held that whether the master had control over the details of the servant's work was the most important factor,[10] that court more recently ignored other factors and instead stated succinctly that "[a]n individual is the agent of another if the principal has the power or responsibility to control the method, manner, and details of the agent's work. If, however, an individual is free to determine how work is done and the principal cares only about the end result, then that individual is an independent contractor."  *Nazar*, 291 S.W. 3d at 606-07 (citation omitted).  The Court, therefore, will focus on whether Freddie Mac had control over the "method, manner, and details" of Eibeck Realty's work.

The issue of whether an entity is an agent or independent contractor is a question of fact for a jury if the facts are disputed; if the facts are undisputed then the issue is a matter of law for the court to resolve.  *Nazar*, 291 S.W.3d at 606. The parties disagree about the legal nature of the relationship between Freddie Mac and Eibeck, but have not really presented particularized, substantive factual disputes.[11]  Accordingly, the Court will resolve the issue as a matter of law.

provision of employee benefits; and the tax treatment of the hired party.") (footnotes omitted).  However, federal courts have applied, without comment, the law of Kentucky in determining whether an entity is the agent of another. *See, e.g., Taylor v Jewish Hosp. & St. Mary's Healthcare, Inc.*, 26 F.Supp.3d 642, 648 (W.D.Ky. 2014).  In addition, the parties' focus is on Kentucky law.  Therefore, the Court will also focus on Kentucky substantive law.  *See, e.g., Mik v. Federal Home Loan Mortgage Corp.*, 743 F. 3d 149, 167-170 (6th Cir. 2014) (using federal procedural law to resolve motion to dismiss but using Kentucky state law to analyze claims against Freddie Mac for wrongful eviction and infliction of emotional distress).

10 *See Landmark Community Newspapers*, 91 S.W.3d at 580 ("The ability to control the specific details of the work is an important factor for a court or administrative agency to consider. However, we do not believe this factor is of greater importance than the others.").

11 Plaintiffs state that the parties disagree over the value of the property taken from the garage.  Doc. 105, p. 4.  But

Plaintiffs' initial argument is that Eibeck Realty was Freddie mac's agent because an employee of Freddie Mac conceded as much to plaintiff Beauchamp.  At his deposition, Beauchamp testified that Michael Henderson, an associate general counsel for Freddie Mac, told Beauchamp on the phone that "Terry Eibeck is Freddie Mac's agent" and Henderson also "admitted liability."  Beauchamp depo., p. 99.  Beauchamp later testified that Henderson "said that, yes, we [presumably Freddie Mac] understand he [Eibeck] trashed out the wrong place and that we are liable for this, but he [Henderson] disputed damages."  *Id.* at 101. However, Beauchamp did not ask Henderson if he meant Eibeck was an agent as such a term is commonly used in real estate or if Henderson believed Eibeck to be an agent for vicarious liability purposes. *Id.* at 102.

Although, surprisingly, the issue was not raised by any party, Henderson's alleged statements present significant hearsay issues.[12] Hearsay is defined by Federal Rule of Evidence (FRE) 801(c) as "a statement that . . . the declarant does not make while testifying at the current

---

that issue goes to an appropriate computation of damages, which is a factor only after liability is resolved.  In other words, the value of the property which was trashed out has no direct bearing on whether Eibeck Realty was an independent contractor or an agent. As Freddie Mac accurately notes in its response in opposition to plaintiffs' motion for partial summary judgment, "[b]oth Freddie Mac and Plaintiffs rely on overlapping evidence, which evidence establishes the events that occurred. The true dispute is over the Court's construction of the evidence, and the legal conclusions to be drawn from the evidence."  Doc. 102, p. 2.   In short, the parties have not presented any genuine factual disputes.

12 Freddie Mac's overly terse response on this point only provides that "any use of the term 'agent' by Freddie Mac's in-house counsel in conversations with Will Beauchamp would not create an inference that Eibeck was anything other than Freddie Mac's realtor. Freddie Mac should not be legally punished for using the common parlance of real estate brokers."  Doc. 102, p. 6.  Nonetheless, a court is permitted to sua sponte consider whether evidence is improper hearsay.  *See, e.g., Bomar v. City of Pontiac*, 2010 WL 3245798, at *10, n.12 (E.D. Mich. Aug. 17, 2010) ("Although Defendants did not argue that the Psychological Evaluation Report is inadmissible hearsay, this Court may *sua sponte* consider the admissibility of evidence in evaluating a motion for summary judgment."); *Wilson v. Ohio*, 178 Fed.Appx. 457, 463 (6th Cir. 2006) ("The district court, *sua sponte,* raised the issue of whether such a statement is hearsay and ultimately concluded that the statement was hearsay. . . . As an initial matter, the district court was correct in raising the issue of the admissibility of the statement. It is clear that, in responding to a motion for summary judgment, Wilson must produce *admissible* evidence to create a genuine issue of material fact.").

trial or hearing . . . and . . . a party offers in evidence to prove the truth of the matter asserted in the statement."  Plaintiffs offer Henderson's alleged out of court statement about Eibeck Realty's relationship with Freddie Mac for the truth of the matter asserted (i.e., that Eibeck Realty actually was Freddie Mac's agent).  Therefore, Henderson's statement is inadmissible hearsay unless it falls within a recognized exception.  Plaintiffs, as the parties seeking to rely upon Henderson's statement, bear the burden to show that the statement is admissible.  *See, e.g., Ungerbuehler v. Federal Deposit Ins. Corp.*, 2010 WL 3732205, at *5 (E.D. Ky. Sept. 20, 2010) ("A party seeking to admit an out-of-court statement bears the burden to show that the statement is not hearsay.").

One recognized exception to the hearsay rule is a statement against interest.  *See* FRE 801(d)(2).  For example, "an out-of-court admission by a party-opponent is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]"  *Ungerbuehler*, 2010 WL 3732205, at *5 (quotation marks and citation omitted).  Merely providing that a party's employee made a statement seemingly against the interests of the employer is insufficient to meet FRE 801(d)(2).  As the Sixth Circuit held, "[t]here is a critical difference between making a statement while one is an employee and having the actual or implied authority to make such a statement on behalf of your employer. The test is whether the statement *concerns* a matter within the scope of the agency or employment."  *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999).

Plaintiff has provided Henderson's name and title but otherwise have not offered any evidence to show that Henderson had the authority to make a statement which could be binding

upon Freddie Mac (i.e., that Freddie Mac's legal relationship with Eibeck Realty was within Henderson's scope of employment).  Freddie Mac doubtlessly employs numerous attorneys and the stray remarks of one attorney on a matter which has not been shown to be within that attorney's regular work portfolio does not meet the hearsay exception of FRE 801(d)(2)).  In short, the Court concludes that what plaintiffs deem to be a controlling concession by Henderson is instead inadmissible hearsay. *See, e.g.,* Ungerbuehler, 2010 WL 3732205, at *5 ("In order for the Court to admit a statement as an admission by a party-opponent, the Court must find that the statement *concerns* a matter within the scope of the agency or employment. . . . Plaintiff provides no proof that any one of the alleged employees to whom she spoke were involved in or had the authority to confirm an order to take possession of a  piece of property. . . . Because the statements allegedly made by the Washington Mutual employees do not, on this record, constitute admissions by a party-opponent, the Court finds that the aforementioned sections of the . . . affidavits present inadmissible hearsay.") (citation and quotation marks omitted).[13]  In any event, though the parties' beliefs about what type of relationship they were creating is a factor used to determine agency status, Kentucky courts have made plain that "substance prevails over form" such that even a contractual clause specifying that one party is an independent contractor is not dispositive.  *See, e.g., CSX Transp. Inc. v. First Nat. Bank of Grayson*, 14 S.W. 3d 563, 566 (Ky.App. 1999) (finding an agency relationship between parties even though their contract

---

[13] In addition, even if the Henderson statements were admissible they would not lead to summary judgment being granted to plaintiffs or denied to Freddie Mac.  Freddie Mac's defense has consistently been that Eibeck Realty was an independent contractor, not an agent.  Therefore, it is highly implausible that a Freddie Mac employee with an undetermined role in Freddie Mac's affairs vis a vis Eibeck Realty would have simply conceded agency status on the telephone to Beauchamp.  In other words, plaintiff's assertion that Freddie Mac conceded agency status is implausible in light of everything else that has occurred.  Indeed, the only indication that Henderson intended to intentionally classify Eibeck Realty as Freddie Mac's agent for vicarious liability purposes comes from plaintiffs' self-serving interpretation of those second hand, stray remarks.

specified one party to be an independent contractor); *Landmark Community Newspapers*, 91

S.W.3d at 580-581 (holding newspaper carriers to be agents/employees despite contractual

language specifying the carriers acted as independent contractors).[14]  Therefore, the Court will

analyze the actual facts and circumstances of the relationship between Freddie Mac and Eibeck

Realty instead of blindly adhering to a term in a contract or any party's subjective beliefs.

     To support their contention that Eibeck Realty was Freddie Mac's agent, plaintiffs rely on

the terms of the contract between Freddie Mac and Eibeck Realty (the "2012 Master Listing and

Services Agreement" which will be referred to simply as "the contract" herein).  *See* Doc. 99-6.

Section two of the contract provides that "[w]ith respect to each listing, Brokerage [Eibeck

Realty] shall act as agent, but not as attorney-in-fact, for Seller [Freddie Mac]."  *Id.* at p. 3.

Freddie Mac contends that the contract's usage of the term "agent" is only a term "commonly

known to apply to the process of negotiating, buying, and selling real estate . . . which is not used

in the same manner as a fiduciary for . . . the range of other special relationships recognized

under the law of Kentucky."  Doc. 102, p. 5.

     The contractual usage of the term agent is, in addition, hardly surprising or conclusive as

that term is common parlance in the real estate business and, in that context, does not necessarily

connote one possessing the broad fiduciary associations associated with vicarious liability.  *See,*

*e.g.,*  Robert L. Raper & Andrew J. Vandiver, *Real Estate Broker Liability,* 36 N. Ky. L.Rev. 409

---

14 *See also* 2A C.J.S. *Agency* § 459 (2015) ("The degree of control giving rise to liability on the part of a principal
for the tortious conduct of an agent who is not a servant depends on the particular facts of each case. How the parties
characterize their relationship is of no consequence as it is the facts of the relationship that control.") (footnote
omitted); 3 Am. Jur. 2d *Agency* § 18 (2015) ("The manner in which the parties designate the relationship is not
controlling, and if an act done by one person in behalf of another is in its essential nature one of agency, that person
is the agent of such other notwithstanding that he or she is not so called. Conversely, the mere use of the word
'agent' by parties in their contract does not make one an agent who, in fact, is not such.") (footnote omitted).

(2009)[15]  A broker is permitted to designate one or more "affiliated licensees" as a real estate

buyer or seller's exclusive "agent" pursuant to Kentucky Revised Statutes (KRS) 344.121(1).  As

Freddie Mac notes in its response to plaintiff's motion for summary judgment, despite the

specific usage of the term agent in the statute "[i]t would be a tremendous stretch of

jurisprudence to . . .  state that every buyer or seller of real estate [thus] becomes vicariously

liability [sic] for all torts and negligence committed by their independent real estate broker."

Doc. 102, p. 6.  In short, the usage of the term "agent" in the contract is not determinative of

whether Eibeck Realty was Freddie Mac's agent for vicarious liability purposes.

Plaintiffs next rely upon section six of the contract, which sets forth some general

guidelines for Eibeck Realty to follow in preserving and managing property, to attempt to show

that Freddie Mac exercised great control over the details of Eibeck Realty's work.  *See* Doc. 99-

6, p. 5-7.  First, the clause unsurprisingly requires Eibeck Realty to comply with applicable state

and local laws.  *Id.* at 5.  After requiring Eibeck Realty to maintain properties in a manner to

make them marketable, the clause also requires Eibeck Realty to comply with "the Eviction

personal property guideline and Emergencies preservation maintenance guideline as outlined in

the QuickSteps for Broker guide."[16]  *Id.* at 6. The clause then requires Eibeck Realty to be

"particularly familiar" with certain specified aspects of the QuickSteps guide.

Among the specified aspects of the QuickSteps guide is a clause requiring Eibeck Realty

to make a report "if there is abandoned personal property totaling $300.00 or more . . . ."  Doc.

---

15 The article synthesizes Kentucky law to explain that "[t]here are three categories of agency relationships: (1) general, (2) special, and (3) universal. While general and special agents have broad authority, a special agent's authority is very narrow. A real estate broker is considered a  special agent of limited authority. Thus, a real estate broker is strictly confined to his instructions, and has only such powers as are actually given or implied from those given. In a typical situation, a real estate broker only has authority to show the property and receive offers, but does not have authority to bind the seller to a contract."  *Id.*  (footnotes and quotation marks omitted).
16 At her deposition Williams testified that QuickSteps is "an abbreviation of the broker guide."  Doc. 100, p. 49.

14

99-6, p. 6.  Eibeck Realty was instructed to "err on the side of caution" if "items may have

particular sentimental value to the former resident (e.g., family photo books, religious books,

etc.) . . . ."  *Id.*  If Eibeck Realty was "uncertain as to [the] value of property" it was to "contact

the Eviction Coordinator for further instructions before proceeding with the trash out."  *Id.*

Similarly, the 2012 Broker Vendor Training Guide provided that if a trash out were ordered and

personal property valued at over $300 or with personal intrinsic value were found, the trash out

should cease, an inventory should be made and the eviction coordinator should be notified.  Doc.

99-7, p. 16.  Examples of items having "intrinsic personal value" were family and wedding photo

albums, family bibles, diplomas and documents related to births, marriages or deaths.  *Id.* at 17.

Section six also requires Eibeck Realty to preserve the property by, among other things, ensuring

that utilities are active and are transferred to Eibeck Realty's name.[17]  Doc. 99-6, p. 7.

Although Freddie Mac did not give Eibeck Realty complete and unfettered carte blanche

to prepare the property at issue for sale, neither did Freddie Mac control the specific method,

manner, and details of Eibeck Realty's work.  Plaintiffs' argument to the contrary

notwithstanding, the mere fact that Freddie Mac set some baseline contractual standards for

Eibeck Realty to adhere to is insufficient to convert Eibeck Realty into Freddie Mac's agent.  *See*

---

17 To further their contention that Eibeck Realty was Freddie Mac's agent, plaintiffs rely upon emails sent from a
representative of Freddie Mac to Eibeck Realty regarding the property at issue.  See Doc. 105-1, p. 6.  Indeed,
plaintiffs seem to believe that the very existence of an electronic communication system between Freddie Mac and
Eibeck Realty (the HomeSteps Connect system) indicates that Eibeck Realty was Freddie Mac's agent.  However,
the email relied upon chiefly by plaintiffs essentially only summarizes some of the general obligations Eibeck
Realty already had incurred pursuant to its contractual relationship with Freddie Mac.  Doc. 105-1, p. 6.  For
example, the email tells Eibeck Realty to make sure the utilities are on and have been transferred to Eibeck Realty's
name, and reminds Eibeck Realty to remove any trash and clean the property.  *Id.*  The Court concludes that the
email in question, either alone or in conjunction with other emails, does not demonstrate that Freddie Mac exercised
a materially increased level of control over Eibeck Realty's day to day affairs when compared to Eibeck Realty's
contractual obligations, nor does the very existence of the HomeSteps Connect system demonstrate that Eibeck
Realty was Freddie Mac's agent.

15

41 Am. Jur. 2d *Independent Contractors* § 11 (2015) ("A contract does not rise to that level of supervision, dominion, and control of day-to-day activities necessary to create a master-servant relationship merely because the contract stipulates that the work must adhere to certain policies, standards, or instructions from the employer.").[18]  That conclusion is reinforced by the fact that Eibeck Realty alone hired the entity which performed the actual trash out (i.e., Eibeck Realty had the ability to hire and directly supervise its own employees/contractors).  In addition, though Freddie Mac set the $300 threshold for determining whether property may be trashed out, Eibeck Realty had the sole responsibility for examining and valuing the property.  Moreover, Eibeck Realty could have declined to accept the responsibility for the foreclosure at issue (i.e., Freddie Mac lacked the ability to force Eibeck Realty to accept that job).[19]  Freddie Mac also did not set Eibeck Realty's working hours.[20]  Finally, the fact that Freddie Mac required Eibeck Realty to undergo periodic training is insufficient to convert Eibeck Realty into Freddie Mac's agent.[21]

---

18 *See also* 41 Am. Jur. 2d *Independent Contractors* § 10 (2015) (footnote omitted) ("[a] requirement that the work be performed according to standards and specifications imposed by the owner is not sufficient to establish the degree of control necessary to make a presumably independent contractor the agent of the owner, but the retention of the right not only to insure conformity with specifications, but also the retention or exercise of the right to direct the manner in or means by which the work shall be performed, will destroy the independent status of the contractor. Stated conversely, where the employer controls the hours worked, keeps track of the driver's movements at all times, and does not allow the driver to refuse jobs, and where such refusal will result in loss of job, these facts are evidence of an employer/employee relationship.").

19 Eibeck testified at his deposition that he accepted the assignment at issue from Freddie Mac.  Eibeck depo. p. 22. Logically, the power to accept an assignment carries with it the concomitant power to decline that assignment.

20 At her deposition, Williams testified that Freddie Mac "would not have said to him [Eibeck], [y]ou have the asset on this day, please conduct the trash out on this day.  That is—that is, you know, decided by the brokerage [i.e., Eibeck Realty] on an asset-by-asset basis . . . ."  Williams depo, p. 82.

21 *See Jones v. A.W. Holdings, Inc.,* 2011 WL 488634, at *6 (N.D. Ind. Feb. 7, 2011) ("Jones argues that AWS exercised 'considerable' control and supervision over her work because she was required to submit documentation for review, had to complete forms, and underwent training. Jones cites no case for the proposition that any of these factors transform an independent contractor into an employee. Moreover, the *Knight* Court specifically held that even where independent contractors undergo training, they remain independent contractors and are not considered employees. Moreover, steps taken to monitor, evaluate, and improve the results of [the] work without supervision over the means by and manner in which he does his work, indicates that the worker is an independent contractor. Likewise, attending meetings does not create an employment relationship. Clearly, this factor weighs against Jones and in favor of AWS's position that Jones was an independent contractor.") (quotation marks and citations omitted).

In summary, taking all the relevant facts and circumstances into account, the evidence shows that Freddie Mac did not control the method, manner and details of Eibeck Realty's work such that Eibeck Realty was Freddie Mac's agent.[22]  Accordingly, Freddie Mac cannot be held vicariously liable for Eibeck Realty's actions and consequently is entitled to summary judgment on all of plaintiffs' vicarious liability claims.

### D.  Negligent Supervision—the Direct Liability Claim

To succeed on a negligent retention/supervision claim under Kentucky state law, plaintiffs "must establish that (1) the employer knew or had reason to know of the risk that the employee created, (2) the employee injured the plaintiff, and (3) the supervision and/or retention of the employee proximately caused the injury."  *Grubbs v. Thermo Fisher Scientific*, 2014 WL 1653761, at *2 (E.D. Ky. April 23, 2014) (citing Kentucky cases).  "In recognizing the tort of negligent supervision, Kentucky has adopted the Restatement (Second) of Agency § 213 which illustrates the requirements for establishing a claim of negligent supervision."  *Booker v. GTEnet.LLC*, 350 F.3d 515, 517 (6th Cir. 2003).  The Supreme Court of Kentucky recently discussed the commentary to that section of the Restatement, albeit in a factually dissimilar case.  *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 336 (Ky. 2014).  Therefore, the Court particularly finds significance in comment d to Restatement §213, which provides in relevant part that "[o]ne who employs another to act for him is not liable under the rule stated in this Section merely

---

22 Though control is the dominant factor, many of the other factors used in the test to determine agency status (*see Landmark Community Newspapers*, 91 S.W.3d at 579) also support a conclusion that Eibeck Realty was an independent contractor.  For example, Eibeck Realty was a separate business entity which had its own offices in Florence, Kentucky (Eibeck depo. p. 5); Eibeck Realty did not represent all of Freddie Mac's Northern Kentucky properties (Eibeck depo. p. 18); and Eibeck had the requisite skill and training to have been a licensed real estate broker in Kentucky since 2004 (Eibeck depo. p. 4).  There is also no indication that Eibeck Realty was paid by the hour; instead the contract between Freddie Mac and Eibeck Realty called for Eibeck Realty to receive a percentage of properties' sales prices as compensation.  Doc. 99-6, p. 7.

because the one employed is incompetent, vicious, or careless."

Plaintiffs argue that Freddie Mac is liable under a negligent supervision theory because it failed to give adequate directions to Eibeck Realty regarding the foreclosure at issue.  Indeed, plaintiffs' theory seems to be a version of res ipsa loquitur—Eibeck Realty could not have trashed out the wrong garage if it had not been negligently supervised by Freddie Mac. However, it is uncontested that Eibeck Realty was given the correct address of the property to be foreclosed upon and, other than speculation, plaintiffs have not shown why Freddie Mac should have anticipated that Eibeck Realty would nonetheless trash out the wrong garage.  Instead, Eibeck Realty's failure to ascertain the correct garage seems to be an isolated incident of carelessness—and negligent supervision is inappropriate based solely on the carelessness of someone hired to do a job.  *See* Restatement (Second) of Agency § 213, comment d.

Plaintiffs have also not explained sufficiently how their theory that Freddie Mac began the foreclosure/trash out proceedings before it had legal title to the property at issue means that Freddie Mac improperly supervised Eibeck Realty.[23]  Finally, plaintiffs make much of the fact that Eibeck Realty was placed on probation by Freddie Mac in January 2013 for failing to complete required online training.[24]  However, plaintiffs have not shown that Freddie Mac knew that Eibeck Realty had failed to complete the training prior to the improper trash out (yet failed to discipline Eibeck Realty) or, moreover, how completion of that training would have led to Eibeck Realty not misidentifying the wrong garage or trashing out plaintiffs' property.  Eibeck

23 Freddie Mac contends that "the Circuit Court of Campbell County confirmed the sale of the real estate to Freddie Mac" prior to the improper trash out.  Doc. 102, p. 8.  Though Freddie Mac's argument is bolstered by an order of the Campbell Circuit Court confirming a master commissioner's sale (doc. 96), the Court need not delve further into this issue because a determination of the precise date upon which Freddie Mac gained actual or equitable title to the property is not necessary to resolve the issues before the Court.
24 Attached to plaintiffs' motion for summary judgment is a certificate stating that Eibeck Realty was suspended in January 2013 by Freddie Mac for "failure to complete required quarterly training[.]"  Doc. 99-8, p. 1.

Realty (arguably) failed to recognize the proper actual or intrinsic sentimental value of plaintiffs' property but that failure was made by Eibeck alone.  It is beyond cavil that Eibeck Realty was aware of Freddie Mac's guidelines regarding how to deal with personal property, yet failed to follow properly those guidelines.  Indeed, the fact that Freddie Mac took corrective action by suspending Eibeck Realty for failing to complete training tends to show that Freddie Mac did supervise actively Eibeck Realty.[25]  In short, plaintiffs have not shown how Freddie Mac knew or had reason to know that retaining Eibeck Realty created a risk of improper trash outs.

### E.  Claims Against Eibeck Realty

The Court has concluded that Freddie Mac is entitled to summary judgment.  The only remaining parties, therefore, are plaintiffs and Eibeck Realty, who are all from Kentucky.  This Court lacks diversity jurisdiction because no parties are diverse.  *See, e.g., Saginaw Housing Commission v. Bannum, Inc.*, 576 F.3d 620, 624 (6th Cir. 2009) ("A district court lacks subject matter jurisdiction in a diversity action where the parties are not completely diverse.").   The Court also lacks subject matter jurisdiction because plaintiffs raise no claims against Eibeck Realty based on federal law.  In short, state tort claims between residents of the same state are not matters within the purview of federal court.  Therefore, the Court will dismiss without prejudice the claims against Eibeck Realty.[26]

---

25 As Freddie Mac persuasively argues:

> Plaintiffs' motion for summary judgment on negligent supervision must fail. Eibeck had all the tools he needed to be successful. He found the condominium unit in building #20, he made an inventory of the property, and he was aware of Freddie Mac's expectations that personal property of sentimental value not be trashed out. Freddie Mac was not required to manage the day-today activities of its independent contractor, which also means that the law should not punish Freddie Mac when Eibeck used his discretion to disregard the rights of the Plaintiffs. Freddie Mac did not breach its duty.

Doc. 102, p. 10.

26 Even if the Court somehow retained supplemental jurisdiction over the claims against Eibeck Realty, the Court would decline to exercise that jurisdiction since all the claims over which the Court had original jurisdiction have

Similarly, on August 29, 2015 plaintiffs filed a motion to add Terry Eibeck, individually, as a defendant.  The motion states that plaintiffs' counsel "recently" requested and received "a copy of the entire liability policy and declaration of coverage sheet" which was the first time "[p]laintiffs and their lawyer were made aware that Kentucky Farm Bureau's named insured is 'Terry Eibeck' and scheduled insureds are First Preston Mgmt Inc & Fannie Mae, 5040 Addison Circle, Ste 400, Addison, TX 75001."  Doc. 114, p. 2-3.

The motion was filed well after the close of discovery and after the motions for summary judgment had already been briefed completely.  In addition, though the motion states to the contrary, adding a new named defendant at this late date would be inherently prejudicial to Terry Eibeck and would likely lead to a motion to reopen discovery.  Therefore, the motion will be denied.  However, as the Court is dismissing without prejudice all claims against Eibeck Realty, the Court will deny the motion to add Terry Eibeck, individually, as a defendant without prejudice so the matter may be addressed fully in any subsequent state court proceeding.

### III.  Conclusion

For the foregoing reasons,

**IT IS ORDERED**:

1.  Plaintiffs' motion for partial summary judgment (doc. 99) is **denied**; and

2.  Defendant Freddie Mac's motion for summary judgment on all claims against it (doc. 97) is **granted**; and

3.  Plaintiffs' claims against Eibeck Realty Group, LLC and Regional Realty are

---

been dismissed.  *See* 28 U.S.C. §1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").

**dismissed without prejudice**;

    4.  Plaintiffs' motion to amend complaint (doc. 114) is **denied without prejudice** without defendants being required to file a response; and

    5.  A separate judgment shall issue herewith.

This the 4th day of September, 2015.

Signed By:

**_J. Gregory Wehrman_**

**United States Magistrate Judge**